392 P.2d 425

Ruth O. VEACH, Plaintiff-Respondent,

v.

Norman J. VEACH, Defendant-Appellant.

No. 9348.

Supreme Court of Idaho.

May 20, 1964.

L. Charles Johnson, of Johnson & Olson, Pocatello, for appellant.

William W. Black, Idaho Falls, for respondent.

KNUDSON, Chief Justice.

Appellant and respondent were married at Fairbanks, Alaska, January 1, 1949. Three children were born as the issue of said marriage, and at the time of the trial of this action were approximately 12, 11 and 8 years of age.

This action was commenced by respondent on April 25, 1962, seeking divorce upon the ground of extreme cruelty, custody of the children, child support and division of the community property. No affirmative defenses were raised by appellant.

Following the trial the court entered an amended judgment granting respondent the divorce, and other relief prayed for. From a judgment entered March 1, 1963, this appeal is taken.

The essential issues raised under the assignments of error are, did respondent's complaint herein state a claim for relief; and, if so, did the evidence and proof summitted at the trial show grounds for a divorce based on cruel treatment?

Appellant does not present any appreciable argument challenging the sufficiency of the complaint, however we shall first consider the questioned portion thereof. Under paragraph V of the complaint it is alleged:

"That the defendant has been guilty of cruel and inhuman treatment toward the plaintiff in the following particulars:

"1. That the defendant has been extremely dictatorial toward the plaintiff and the children ever since the time of the marriage.

"2. That on more than one occasion the defendant has been unduly abusive to the children.

"3. That the defendant belittles the plaintiff by remarks made to the plaintiff and by his actions toward the plaintiff.

"4. That the defendant is inclined to frequently change jobs and causes the family to move from place to place.

"5. That the defendant is not inclined to pay his lawful debts and this fact does not worry him.

"6. That the defendant is very willing to let someone else than himself support his family.

"7. That on numerous occasions it has been necessary for the parents of both the plaintiff and the defendant to feed and clothe the children.

"8. That during the past year the parties hereto have quarreled many times over all types of family matters.

"As a result of defendant's actions and conduct, plaintiff has and does suf-

fer from extreme nervousness and mental anguish so that a continuance of the marriage state has become no longer endurable. That all the acts and things done by the defendant and suffered by the plaintiff are done without any cause or provocation on the part of the plaintiff."

Although appellant denied those allegations, proof conceivably could be adduced under such allegations as to constitute adequate grounds for divorce based on extreme cruelty. The complaint sets forth a claim for relief.

█ Appellant strenuously contends that the evidence produced is not sufficient to sustain the trial court's findings and conclusions that respondent is entitled to a divorce on the ground of extreme cruelty. After a careful review of the record, we are unable to agree with such contention.

The three findings concerning which appellant contends are not supported by competent evidence are, amended findings Nos. 5, 6 and 7, which provide:

"5. That there has been unusual domination of the family affairs by the defendant. That in most cases the domination was exceeding paternalistic influence, but in the matter of finances this domination went beyond the normal limits. The defendant did not deny that plaintiff's suggestions were met with constant rebuff, but did deny that said suggestions were met with silence.

"6. That the family income was divided between the plaintiff and the defendant for 'budgetary purposes' but that the control over the budget was completely at the hands of the defendant.

"7. That both parties to this action are well educated persons and it is apparent that the domination by the defendant of the plaintiff would and did have a deleterious effect upon the physical and mental health of the plaintiff. The defendant did at no time deny the fact that the plaintiff suffered either mentally or physically from his conduct. That the domination of the plaintiff by the defendant in both financial and household matters did constitute a most unusual situation."

Respondent's testimony in support of her case in chief, both direct and cross-examination, consists of over 60 pages of the transcript, and it would unduly extend this opinion to identify or set out all of respondent's testimony which may be considered as supporting the above quoted findings. However, we deem it proper to quote some excerpts from respondent's testimony which tend to support the challenged findings and conclusions of the trial court.

As concerns the unusual domination of the family affairs by appellant, respondent testified:

"Q Well, there was considerable trouble between the two of you because you thought that he was dictatorial and you were stubborn and resisted what you thought was dictatorial, is that it?

"A I finally got to the point, yes, frankly, where it didn't much matter what he offered, I intended to bristle at it. When I realized that last winter it came to me that this was not helping the situation, that I must try to be considerably more loving and kind and I really did try to overcome that. But I had taken it so long that honestly I had to consciously work to try to receive his suggestions as nicely as they should be received. I did try to do that. It did not do any good. It didn't make for better relationships at all. That's the way I felt.

"Q He continuously made suggestions to you for the improvement of your relations?

"A The type of suggestions I have had have all been the type where I must change my character. Yes, I have constantly been worked on and trained and molded since the day we were married."

    *     *     *     *     *     *

"A * * * Also, I felt that I was completely disregarded in front of the children. He by-passed me constantly in matters of authority or in anything that had to do with the children or the home. I was nothing but the one who was getting the meals and acting the part of the wife, and a slave."

In explaining the extent to which she had been consulted relative to the family affairs, respondent testified:

"A * * * But I didn't feel that I was consulted. He went through the token—part of the time—token business of consulting me a little bit, but underneath it I just felt it didn't matter much what I said anyway; he did what he wanted. And that's just the way the whole family life was run.

"Q Your real complaint is that he wouldn't consult you about things?

"A Basically, Mr. Denman, my complaint is simply the dictatorship, yes sir, that's it."

In response to an interrogation as to how the home was handled and whether her ideas and suggestions as to how to run the home were given consideration, respondent stated:

"A Yes, I always felt, for instance, that I had no freedom in arranging our homes. When we would move into any place, Norman set the furniture and dictated as to what part of the house should be storage space and what

part would be his shop and I could have what was left. * * *"

\*    \*    \*    \*    \*    \*

"A  Well, as far as rearranging the house, there was nothing to do about that; it was just to stay the way that Norman wanted it.  And I became quite discouraged over trying to keep house in such circumstances.  So it was very hard to be interested in keeping the house.  I had the feeling that either I did what was requested and required or else I would have to pay the penalty of being ignored or not talked to or various other things like that, which to me were very distressing.  And even after I did decide that I should work harder to do my part to make the home nice, I got nothing but rebuffs for it.  I started painting the home out of my half of the income, which meant little by little, and received *no commendation*; just—I was ignored for my efforts."

Referring to the control of finances and in respect to cost of sending the laundry out and purchasing particular foods that appellant wanted and which respondent felt she could not afford to do within her allotment of the income, respondent testified:

"A * * * Norman said he would lend me the money out of his half and some day when our income got high enough then I could start paying him

back the money I borrowed.  He also wanted to lend me the money to buy more expensive food with the understanding that at some indefinite time in the future I would pay it back.  And since debts bother me very, very badly, I refused to do that, which was taken as a most unyielding position."

The evidence tending to prove cruelty was in some respects in conflict. However, for the most part the acts complained of were not specifically denied, but, as appellant states in his brief, "The testimony of Norman J. Veach supplements and explains the testimony of the Respondent without any real contradiction.  That is to say the Respondent did not choose to contradict any of the testimony of the Appellant in his explanatory and more detailed facts concerning the incidents cited by her in her examination in chief and cross examination."  Under these circumstances the evidence should be viewed in the light most favorable to respondent. Jordan v. Jordan, 69 Idaho 513, 210 P.2d 934.

Appellant argues that "When the marriage relationship has not completely and finally broken down and where the differences are trivial, insubstantial or imagined, the very policy, and the very law itself as pronounced by this court in repeated decisions, is to deny the final separation, the final divorce, the final ending of the

family." It must be conceded that a divorce should not be granted for trifles, and from appellant's argument it is evident that he does not consider that his marriage relationship with respondent has finally broken down. However, the following quoted testimony of respondent leaves a very different impression:

"Q Mrs. Veach, shortly after this case was filed do you recall a conference which was held in the office of Mr. Denman, where you and the defendant and Mr. Denman and myself were present?

"A Yes sir, I do.

"Q And at that time was an effort made to reconcile this marriage and to get rid of this matter?

"A Well, yes, you and Mr. Denman called the meeting specifically for the purpose of reconcil ation.

"Q And in your own mind did anything in the line of reconcil ation come forth from this conference?

"A Frankly, no. I appreciated your efforts, but Norman sat right there and said that he was going to be boss and that was it. He has told me exactly how things would be if I were to go to Seattle with him. * * * and whereas he felt that things had not gone well in Idaho Falls, the cure for it lay in a much firmer dictatorship. He would be the complete boss down to the last detail and he would take over the household finances completely. I was not to have any say about—at least this is my impression—I would not have one say about the house, the furniture, the management or the children. I was simply going along as a wife who was to go to work. Under these circumstances I can not possibly be interested in a reconcil ation. * * *."

Appellant argues that there was no substantial evidence submitted of any acts on his part which had a deleterious effect upon either the physical or mental health of respondent. It is generally recognized that "extreme cruelty" as a ground for divorce cannot be given an inclusive or exclusive definition. The particular acts of cruelty complained of are in and of themselves the determining factor, but the question of whether the alleged acts of cruelty caused grievous mental suffering on the part of the innocent party is the determining question. Parsons v. Parsons, 72 Idaho 455, 243 P.2d 973.

It is not feasible to discuss each of the various incidents referred to in respondent's testimony which tend to support her contention. Suffice it to say that it is entirely adequate to convince a trier of facts that she was the subject of a continuing course of unrelenting domination. Even appellant, while reviewing past conditions

at the home, acknowledged that "there was a great deal of tension."

The trial court found that there had been "unusual domination" of the family affairs by appellant, and it is recognized that any unjustifiable and long-practiced course of conduct by one spouse toward the other which utterly destroys the legitimate ends and objects of matrimony constitutes extreme cruelty. Paul v. Paul, 183 Kan. 201, 326 P.2d 283.

From the narrative of the unfortunate relationship that developed between these parties it is apparent that the family relation of these parties is at an end. The following are excerpts of respondent's testimony made in response to questions relating to a possibile reconciliation: "I cannot accept a total dictatorship * * *" and also: "I am not even interested."

This court has repeatedly held that the judge who tries the case, and has the parties before him for observation in the light of the evidence, is the one to whom the law commits the determination of this question in the first instance; and this court will not disturb a finding that particular acts constitute grievous mental suffering, unless the evidence in support of the finding is so slight as to indicate a want of ordinary good judgment and an abuse of discretion by the trial court. De Cloedt v. De Cloedt, 24 Idaho 277, 133 P. 664; Riggers v. Riggers, 81 Idaho 570, 374 P.2d 762;

Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788.

From our examination of the record we are convinced that the evidence supports the finding of the court and the judgment of divorce.

Judgment affirmed. Allowance to respondent of attorney fee and costs on appeal as fixed by order of the district court dated June 5, 1963, approved.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.